Thank you your honor. Paul Fleishman on behalf of the plaintiffs, Matthew Wilson and Sharon Naylor. How are you? I'd like to ask you a question. Yes. Just carry me through the sequence. The plan in this case, the ERISA plan in this case, originated somewhere around 1998. Yes your honor. And then in 2002 was substantially modified. Yes. Now in 2002, was a new document issued that someone concerned could consult to determine the rights of the parties? Yes your honor. All right. In 2009, an amendment was issued. Yes. Was that amendment ever incorporated into a single document outlining the rights and responsibilities of the parties? No your honor. And so after 2009, if someone was concerned about what were the rights of the parties, he or she would have to take two pieces of paper, set them down, and mentally integrate the one into the other? Yes your honor. Thank you. At the time plaintiffs stopped working, the amendment hadn't been written. It was in 2009. He sought a lump sum, Mr. Wilson sought a lump sum payout for his pension. Can you also tell me, what is the difference in money that this makes? It's pretty substantial. It's about, and I don't have an exact sum, but it's about $100,000 for Mr. Wilson and about $50,000 for Mr. Mailer. Okay. So we stopped working. But if they were to opt out to just take the pension, not on a lump sum basis, it wouldn't affect them at all? Well they had already, I'm sorry your honor, they had already elected to receive a lump sum at the time the amendment was written and signed. So I'm sorry, so the sequence is they make the election and then there was an amendment? Yes your honor. In fact the amendment was signed after Mr. Wilson had arranged to, I think actually... Would they have been allowed to rescind their election? Your honor, I'm not sure. I'm not sure your honor. It wasn't ever addressed. They had planned their futures based on receiving the lump sum. And when they stopped working they expected to receive what the plan told them that they had received previously. And they don't want death as a remedy? I don't think so your honor. They've already been paid a portion. Even when the amendment was signed, Mr. Wilson had already been paid a portion. Well I understand, but things can be undone. You can go back, rerun the numbers, recalculate what they would have been paid in continual payments. In the meantime, this is just math. Just accounting. Not to say that we can all do the accounting. Most of us can't. But there are people, you know, this is simple enough to run the thing back. No, I understand. But that's not something they would want or sought. I think that would have required them to have paid back the lump sum, which might not have been financially feasible for them, given that they had just quit their jobs, you know, in reliance on receiving the lump sum. You're not contesting in this proceeding the right of the plan to have a retroactive amendment that would affect the interest rate utilized in order to discount a stream into a lump sum? You're not saying that's improper? If I understand your question, I don't believe that's improper if it's done correctly. I don't think it's improper to amend the plan to be retroactive. Section 1107B2A of the PPA requires that if it is going to be retroactive, it has to have been applied in conformance with the amendment during that retroactive period. Defendants never provided proof of that. There's been some conflicting testimony regarding whether or not that was, in fact, the case. This is kind of a small business, right? Your Honor, I'm not exactly sure of the size of the business. I know it had several employees. Well, but I mean it's not like 100,000 people. No, Your Honor. I don't believe so. So is, do you, well, you want de novo review here, right? Yes, Your Honor. All right. But even if it were abuse of discretion, and you look at a body and then you look at the other factors that have to be considered when the abuse of discretion, is your strongest argument that the plain language is not, that the plain language is clear so you don't get into giving the plan the opportunity to make an interpretation and that essentially whoever drafted this just did a terrible job, and that's their problem, and it says what it says, and your clients win? Your Honor, I think that's correct. The language of the plan is paramount. But if it's ambiguous, then they get, let's say if we were to conclude, and I'm not, I'm just saying this hypothetically because we haven't even talked about it, so I'm not stating that as anyone's position. If we were to determine that it was ambiguous, then the plan gets to interpret it, right? Well, I don't think the plan gets to interpret it however it chooses. No, but I mean, but they get that, if it's clear, they don't, then their interpretation is only right if we think it's right, correct? If it's clear, I think the clear language of the plan. Would control. Yes. But here the district court found that it was ambiguous, right? Yes, Your Honor. And then gave some deference to the plan's interpretation. Yes, Your Honor. The district court, in fact, found that because they had delegated their authority to Leiden that there was no conflict of interest, which is unusual because in order for that to be the case, it has to be a complete delegation of authority. But if that's the case, then Leiden doesn't have discretion under the plan. So there is no abuse of discretion review. It's de novo. Either Leiden made the decision, in which case the center of review is de novo, or Mr. Solomon made the decision, in which case there's a lot of evidence that he was a very conflicted administrator. He threatened to sue plaintiffs and other claimants on multiple occasions for the cost of administering their claim, and he never fully considered any of the allegations made by claimants. In fact, even the district court found that plaintiffs sought to obtain what they believed to be the proper amount of benefits under the ambiguous language of the plan, a right which is expressly granted to them under 29 U.S.C. 1132a1b. In response, defendants merrily denied plaintiffs' request without explanation and threatened litigation. That was the court's finding. It's hard for me to see how an administrator who doesn't provide an explanation for his decision and threatens litigation should be given deference. Counsel? Yes. Would you agree that a document, for purposes of contract law, but a document could be unintelligible, poorly drafted, hard to understand, and not be ambiguous? Ambiguity has a discrete meaning in the law of contracts. Yes, Your Honor. I think there can be a poorly drafted document that is unambiguous. And the meaning, distinguishing between the ship perilous not arriving on time, a latent ambiguity, which is not relevant here, that to have a patent ambiguity, the clear language of the policy has to point to two alternate meanings, and the ambiguity is resolved by choosing one of the meanings. Is it your understanding that the trial judge in this case, the district court, found that there were two reasonable interpretations of the agreement and resolved the dispute by picking one of them? Or is it your understanding that the district court found that the plan clearly intended to comply with a change in the existing law, the Patent Protection Act, and that it's so clear that you should read that into the two and reach a result on that basis? Is that your understanding of what the district court did? Yes, Your Honor. I think that is what the district court did. It found that the intent was very obvious. I don't think it was as obvious as the district court found, and that regardless of the language, it should follow the intent of the drafter. I have a question. What part of the text in the amendment was intended to actually go into the plan as amended? Does everything after the initial paragraph go into the amended plan, or does only the text that is quoted after the number two go into the amended plan? Your Honor, I can't tell you how defendants intended it to be. In their response brief, defendants, for the first time, kind of provided how they would imagine the amendment being read. I'm sorry, Your Honor, I can't find it. So your understanding of their view is that does the amendment replace all of Section 1.3 or only some of it? What's their point on that? If you look at their brief, it's docket 16.1, page 11. I'm sorry, their brief? Their appellate brief. The red brief here? I believe so. I don't know how the colors work. I'm colorblind. Their appellate's brief. Yes, the appellate's brief. Their response to you. Yes, their response to my brief. On what page? On page 6, it's page 11 of the actual docketed. According to their enumeration, it's page 6. According to their enumeration, it's page 6. And they put the italics part of that section is the actual amendment part, and then the non-italics is the pre-existing language. So it seems like they intended part of Section 1.3 to be replaced and not the entire section. But the amendment doesn't specify how it's supposed to fit in, except for that it's meant to add, it says, and all other languages. And your view would be that, what would your view be? My view would be is that it doesn't, without further guidance, it's not clear how it's supposed to fit. And the only logical way that it could fit is to add new language, and as it says, keep the remaining language there. And that if so, then it's not ambiguous at all. It adds the segmented rate provided by the PPA for determining whether or not consent is required for top-heavy minimum benefits. And I just think that's very reasonable, and that's the way it should be read. And so your clients aren't top-heavy? No, they're not top-heavy, Your Honor. Top-heavy is defined in the regs, isn't it? Yes, Your Honor. And it's described also in paragraph 5.7 of the original, well, not the original, but the later amended plan, but the complete document as opposed to a part of the amendment. Another aspect, I think, weighing against discretion and towards, Your Honor, I'd like to preserve the rest of my time for rebuttal. Okay. Thank you. We'll hear from the opposing counsel. Counsel, would you agree with your opponent that the amendment of 2009 was never formally integrated into a single document, either by the drafter or by the plan administrator or anybody else, and that in order to understand the rights and responsibilities of employer-employee, an individual would have to put the two documents side by side and mentally integrate them? That is correct, Your Honor. I would agree with that assessment. You're Mr. Hadick? Yes, Your Honor. Okay. And this, what you have on page 6 of your brief, is the integrated version? That would be our interpretation of the integrated version because if you go to the 2009 amendment, and it's in quotes as to what it's amending and adding to section 1.3, which governs the actuarial equivalent, the definition of that, it adds a paragraph 2. So it's adding language to existing paragraph 1.3, which defines actuarial equivalent. And that paragraph, as it originally read, and as it still does, we believe, starts with actuarial equivalent means, and then it goes on to state, an amount shall be determined by the mortality table and interest rate specified above, or the applicable mortality table and applicable interest rate described below, whichever produces the greater benefit. Then this new paragraph, paragraph 2, and subsections thereof from the 2009 amendment are added to the section below that. But the way you want to integrate it, you have to cross certain things out too, right? Yes, you do. You have to eliminate the prior assumptions because it would make no sense to have two assumptions there because you wouldn't know which ones apply. Right. But I've never heard of when you make an amendment that unless you do the deletions, that we do the deletions for you to have it make sense. What's your best case that stands for that proposition? Well, Your Honor, frankly, this isn't the most artfully drafted amendment, and it was drafted by the third-party administrator in this case. Okay, well, I think we'd all probably agree to that. So if your client drafted this and did a bad job, but the way that you drafted it, there's a plain meaning of it, even though it's not what you intended, why don't they get the benefit of that? If it's bad drafting, but it's really plain when you read it, but it wasn't what you intended, why should we give you what you intended? I mean, shouldn't the bad drafting go on you? I think the premise there, I don't agree with the premise of that question, Your Honor. Because of the way the amendment was drafted, there's a paragraph 2. So it continues. It does not replace the entire Section 1.3 of the plan. It continues, and it adds interest rates. And when it is read in toto, the logical conclusion is that it's intended to replace the assumptions that existed prior to the amendment with the PPA, the Pension Protection Act assumptions, the segmented rates. It's not intended to replace all of Section 1.3, only some of it. Is that right? Only some of it. And so if the amendment was intended to replace all of Section 1.3, then the original paragraphs discussing actuarial equivalent would have been eliminated by the amendment, leaving only the discussion of top-heavy minimum benefits. Wouldn't it then follow that the amended Section 1.3 does not address calculation of the actuarial equivalent at all? That would be correct, Your Honor, and that would make no sense, because there would no longer be a provision in the plan to deal with actuarial equivalents for lump-sum calculations. Okay. So we would have to find that it's ambiguous in order to allow you to make this interpretation, correct? If we think that it's plain, terribly drafted, but plain as could be, you lose, right? That would be correct, Your Honor. Counsel? In the way the amendment is drafted, there's a reference to the purpose of the amendment is to add. Now, in order to reach the position advocated in the red brief, don't we have to interpret the word add to mean substitute? And if we do, is that something we could do? Well, I think add means to add. I mean, the plain meaning of add is to not necessarily replace, but to augment, perhaps. And in this case, the way the amendment reads, paragraph 2, the assumptions contained in this paragraph 1.3 shall be used for top-heavy minimum benefits, et cetera, et cetera, if applicable, which means that it's also contemplating using those assumptions for the actuarial equivalent calculation. Why isn't that language equally consistent with to be used if applicable? And if not applicable, you go back to what we originally had. And that's an interpretation that could be taken by an objective observer reading these documents. But these are two interpretations which, in my estimation, are equally plausible, which, under an abuse of discretion standard, the plan administrator is entitled to utilize or to rely on that interpretation that he believes is true. Granted, I think both of you agree, and there certainly is a basis for the agreement, that the document was not properly drafted to accomplish the goal and that interpretation is required. But is the problem there that the document is ambiguous in that there are two equally reasonable interpretations and in the course of exercise of discretion one must be chosen, or is the claim that it's unintelligible and that you have to look to the intent of the parties, and in this case, since it's a unilateral contract, the intent of the drafter to determine what she meant? Your Honor, I don't think it's unintelligible. And there's two parts there. The intent of the drafter, and as the district court found, was to provide for these new assumptions under the Pension Protection Act, which authorized these new assumptions, with a ceiling. That intent was clear. That then, when interpreting a contract, it's also important to then look to the intent of the parties, and when you look to the intent of the drafting party in this case, the intent was to supplant the prior assumptions with these new assumptions. Well, you normally, when you have a current contract, you look at the intent of the parties, but here there are no two parties. There's only one party. So the intent here is we want to pay you less. Yeah, so it's not one of those situations where you say, well, you look at the intent of the parties because they supposedly have opposing interests, and so if they both intend the same thing, that's helpful in construing it. I'm still having trouble understanding why this new paragraph applies to anything other than top-heavy minimum benefits. If it was meant to apply to all of them, why wouldn't they have just left out any reference to top-heavy minimum benefits? Why wouldn't they have just said this is what applies? Unfortunately, Your Honor, the third-party administrator prepared this, wasn't entirely specific. Let me ask you, let me phrase the question somewhat differently. Let's say we were to take a pen, and it said the assumptions contained in paragraph 1.3 shall be used for, shall be used and then go to determine whether benefits offered require, and so on, and skip all those words, be used for purposes of top-heavy minimum benefits on the paragraph. Let's say we skipped all that line. Would that do what you say it does? If you just took all that reference to top-heavy minimum benefits altogether? That would probably solve the problem. No, no, I didn't ask you whether there was a problem or not. Would that then be the meaning which you are advocating? Yes, I would agree. So why isn't the fact that they have this thing in there that seems to be superfluous, given your interpretation of what this thing means, why doesn't it make it perfectly clear that it only applies to those things? It doesn't say to those things and others. It just refers to, it has a limitation in there. Why wouldn't constrain it the way you want to simply read the limitation out of the language? I don't think it is limited. The way Your Honor is reading, I don't think it is limited. Well, if you're telling me that removing the language would achieve the very interpretation you want, then adding the language must be a limitation. It must do some work. It must have some purpose in here. What is the purpose of having the reference to top-heavy minimum benefits? Well, I think that those assumptions are intended to be used with top-heavy calculations as well. But you say it would have achieved that purpose even if you had no reference to them. Yes, but at the same time it would. I mean, the way it reads, it's saying these assumptions... Well, if you want to have it apply to A and B, you could do it one of two ways. You could say it applies to A and B, or you could just say it applies. But you wouldn't say it applies to A and implicitly it also applies to B, wouldn't you? I mean, you know, it's not how any rational person would draft it. Well, I think the way it was drafted, and again... I mean, if an associate in your office drafted something like that, it would be in the RIDAC, right? Well, I certainly would not be happy with the draftsmanship. Well, more to the point, you wouldn't... a better draftsmanship, you know? If you want to go on the cheap and have schlocks amend your plans, then you might get stuck with them. You should hire a lawyer. That's a fair point, Your Honor. You know, it isn't just... Or maybe this really does mean what it seems to say, which is they added something applying only to top-heavy and minimum-benefit plans. Again, draftsmanship aside, I think the way it reads, because it adds a paragraph, too. It continues from the prior Section 1.3. If this was intended to eliminate Section 1.3, there would be no actuarial equivalent provision in the plan. It would render a lump sum calculation completely undoable. You could not have a lump sum. I have no idea what you're saying. I have no clue. Why isn't reading this as applying merely to top-heavy minimum benefits, this new paragraph? Why doesn't that... Is that perfectly consistent with the plan, entirely workable, and avoids any ambiguity, any... You agree that this is not a top-heavy minimum benefit plan, right? Yes. Why isn't reading it that way avoid any problem whatsoever? I think it would create more ambiguity because... Tell me why. Because you wouldn't know which assumptions to apply for an actuarial equivalent calculation. You would say, look, when you have a top-heavy minimum benefit plan, you apply this new language, and when you deal with something that's not, you apply the language of the paragraph above, which is the language of the original plan. I beg to differ with that analysis and that interpretation because this amendment states, for purposes of top-heavy minimum benefits, if applicable, which is the key phrase there. So you can use these assumptions with top-heavy minimum benefits, if applicable, and if you're using it for actuarial equivalent... Focusing only on top-heavy, when wouldn't it be applicable? Well, it wouldn't. It would be either applicable in the context of a lump sum or a top-heavy calculation. You know, I think what you're arguing, and I've been thinking about this, is you're trying to say that, say, if we were interpreting a statute, one of the arguments would be that a certain interpretation would reach an absurd result. All right, and so then we would look to maybe the preface of what Congress is doing and all of that. But this is a contract, and so it seems to me that you're asking to get the same benefit in saying, well, if you interpret it that way, even though it exactly says that, it would be absurd, and it wouldn't be what the plan, you know, whoever drafted this, intended. But I don't think you get that same absurdity approach that we do when we look at a statute. That seems to me what you're saying. Not necessarily. What I'm saying is that, Your Honor, if we take appellant's interpretation and we apply it to this plan, then when you're calculating a lump sum, you have absolutely no idea which assumption you're applying,  Why is that the case? Why wouldn't you say if you're dealing with something that's not a top-heavy minimum benefit plan, you just use old assumptions? You know, this is something that's added to deal with those kinds of plans and everything else deals with them? Why is that not workable? Your Honor, that is workable. Why is that if it's workable, then it's not absurd? And if it's not absurd or impossible, then why isn't that the interpretation we must adopt? Your Honor, that interpretation would not be absurd, but at the same time, the contrary interpretation would not be absurd. And that's where we get into the thicket of the arbitrary and capricious standard where when you lump it, when you look at these documents together and you read them together... Well, I think it would be absurd if you have something that seems to be limited to certain kinds of plans and we would sort of allow the administrator to say, well, this applies to everything, and we have to go through and strike out portions of the whole plan. You don't have to do any striking out to adopt this interpretation, right? Pardon me, Your Honor? You don't have to do any striking out. You don't have to do any crossing out of anything to adopt this interpretation that applies only to top-heavy benefit plans, right? No, you would not have to. Perfect. They just plop it in. It's just consistent with what they did. They plop it in. We don't have to do any striking. We don't have to do anything else. Why isn't that the end of the case? I think you need to go settle this is what I think you need to do. Quick. That's my view. Anyway, you're out of time. Thank you, Your Honors. Do you have anything further? Unless you have any questions, Your Honor. No. Okay. A few folks are in the steps of the courthouse and are moved to engage in settlement discussions. You may file something in the next 24 hours asking us to vacate submission for you to pursue them. If you would like the help of our mediation office, they are always willing and able to help out. Okay? But failing hearing from counsel, the case will be submitted and decided. Thank you.
judges: Singleton, Kozinski, Callahan